# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

CHARITY FIGGINS,

      Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. C13-3022-MWB

**REPORT AND
RECOMMENDATION**

---

## *TABLE OF CONTENTS*

**I.**    **INTRODUCTION**..........................................................................2

**II.**   **BACKGROUND**...........................................................................2

**III.**  **DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF** .........3

**IV.**  **SUMMARY OF ALJ'S DECISION** .....................................................5

**V.**   **THE SUBSTANTIAL EVIDENCE STANDARD**................................. 12

**VI.**  **ANALYSIS** ............................................................................. 13
     **A.**    *Did The ALJ Err In Evaluating The Medical Evidence?*................ 14
         **1.**    *Applicable Legal Standards* ............................................ 14
         **2.**    *Discussion* ................................................................. 15
             *a.*    *Dr. Vos*............................................................ 15
             *b.*    *Dr. Ramos*........................................................ 21
             *c.*    *Nurse Johnson* .................................................. 22
             *d.*    *Dr. Harper* ...................................................... 22
             *e.*    *State Agency Consultants*...................................... 24
             *f.*    *GAF Scores* ...................................................... 25
             *g.*    *The Nevland Problem* .......................................... 27
     **B.**    *Did The ALJ Err In Assessing Figgins's Credibility?* ..................... 30
     **C.**    *Was The VE's Opinion Testimony Flawed?*................................ 32

**VII.** *CONCLUSION AND RECOMMENDATION*....................................... 33

# I. INTRODUCTION

Plaintiff Charity Figgins seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for Social Security Disability Insurance benefits (DIB) and Supplemental Security Income benefits (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Figgins contends that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled. For the reasons that follow, I recommend that the decision be reversed and remanded for further proceedings.

# II. BACKGROUND

Figgins was born in 1984 and was 25 years old on her alleged disability onset date of November 5, 2010. AR 11, 232. She has a GED and past relevant work as a nurse aide and residential aide. AR 32, 352. She protectively filed her applications for DIB and SSI on November 5, 2010. AR 11. The applications were denied initially and on reconsideration. *Id.* Figgins then requested a hearing, which was conducted May 14, 2012, by Administrative Law Judge (ALJ) John Sandbothe. *Id.* Figgins testified during the hearing, as did her counselor and a vocational expert (VE). AR 30-59. The ALJ issued a decision denying Figgins's application on June 13, 2012. AR 11-21. On February 20, 2013, the Appeals Council denied Figgins's request for review. AR 1-3. As such, the ALJ's decision is the final decision of the Commissioner. AR 1; *see also* 20 C.F.R. §§ 404.981, 416.1481.

On April 16, 2013, Figgins commenced an action in this court seeking review of the ALJ's decision. This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues and the matter is now fully submitted.

### III.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing,

and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own

medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## IV.    SUMMARY OF ALJ'S DECISION

The ALJ made the following findings:

> (1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

> (2)    The claimant has not engaged in substantial gainful activity since November 5, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

> (3)    The claimant has the following severe impairments: hepatitis C, bipolar disorder, anxiety, obesity,

borderline personality disorder, and history of substance abuse (20 CFR 404.1520(c) and 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), as she is able to lift or carry 50 pounds occasionally and 25 pounds frequently but is limited to simple, routine, repetitive work with superficial contact with the public and no more than a regular pace.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on November 21, 1984 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

> (11) The claimant has not been under a disability, as
> defined in the Social Security Act, from November 5,
> 2010 through the date of this decision (20 CFR
> 404.1520(g) and 416.920(g)).

AR 13-21.  At Step Two, the ALJ found all of Figgins's claimed impairments (hepatitis C, bipolar disorder, anxiety, obesity, borderline personality disorder, and history of substance abuse) to be severe, as they cause more than minimal limitations in her ability to perform work-related activities.  AR 13.   At Step Three, the ALJ found that none of Figgins's impairments, individually or in combination, met or equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  AR 14.  With regard to the physical impairments of hepatitis C and obesity, the ALJ noted that no evidence indicates limitations or complications sufficient to satisfy any listing.  *Id.*  Figgins does not challenge this finding.[1]

As for mental impairments, the ALJ stated that he considered listings 12.04, 12.06, 12.08 and 12.09, and concluded that Figgins's impairments do not meet those listings.  *Id.*  He first analyzed the "paragraph B" criteria, noting that to satisfy these criteria the impairments must cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation.[2]  *Id.*  A "marked" limitation is one that is more than moderate but less than extreme.  *Id.*  The ALJ found that Figgins

---

[1] As the Commissioner points out, Figgins's briefs in this case do not raise any arguments concerning the ALJ's evaluation of her physical impairments.  As such, I will not engage in a detailed analysis of the physical impairments herein.

[2] Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 CFR Part 404, Subpart P, Appendix 1.  Repeated episodes of decompensation, each of extended duration, means 3 episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  If the episodes of decompensation are more frequent and of shorter duration or less frequent and of longer duration, the Commissioner must "use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."  *Id.*

had no restrictions concerning activities of daily living, mild difficulties in social functioning and moderate difficulties with regard to concentration, persistence or pace. *Id.* The ALJ also found that Figgins had experienced no episodes of decompensation which have been of extended duration. *Id.* Therefore, the ALJ found the paragraph B criteria were not satisfied. AR 15. He also stated that he had considered the "paragraph C" criteria and that the evidence failed to establish those criteria, as well. *Id.* Figgins does not challenge any of these findings.

At Step Four, the ALJ provided a residual functional capacity (RFC) assessment and found that Figgins had the RFC to perform medium work[3] except that she is limited to simple, routine, repetitive work with superficial contact with the public and no more than a regular pace. *Id.* In explaining this determination, the ALJ first addressed the credibility of Figgins's statements concerning the disabling effects of her impairments. AR 15. He referenced the relevant factors for weighing a claimant's credibility and concluded that her statements were not credible to the extent that they were inconsistent with his RFC determination. *Id.* He provided the following reasons for this finding: (1) Figgins's allegations of total disability are inconsistent with the objective medical evidence, (2) her own statements concerning her activities indicate that her symptoms are not as severe as alleged, (3) Figgins's ability to work on a part-time basis and her efforts to find full-time employment were inconsistent with her allegations and (4) the medical opinions, as weighted by the ALJ, do not support Figgins's allegations. AR 16-19.

With regard to the medical evidence, the ALJ acknowledged that it "reflect[s] a long history of depression, bipolar disorder, borderline personality disorder, and substance use including methamphetamines, cocaine, marijuana, and alcohol." AR 16. He noted, however, that she completed addiction treatment in August 2010 and that she receives ongoing therapy to manage her mental health symptoms. *Id.* The ALJ pointed

---

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c) and 416.967(c).

out that Figgins's treating psychiatrist, Dr. Ramos, managed her symptoms with medication and, in December 2010, found that she demonstrated a good mood, full affect, no suicidal or homicidal thoughts and no paranoia. *Id.* At the same time, however, Dr. Ramos expressed concern about Figgins's use of marijuana. AR 548. Indeed, she had stopped taking her prescription medication (Risperdal) and instead was smoking marijuana three times a day, declaring it to be "the wonder drug." *Id.* Dr. Ramos counseled Figgins to stop using marijuana and prescribed Invega as an alternative. *Id.*

The ALJ next discussed Figgins's visits to the emergency room in January 2011, where she reported anxiety and feelings of hopelessness and worthlessness. AR 16. Figgins denied having suicidal ideation but indicated that she was still smoking marijuana daily. AR 556. After her second visit in three days she was admitted to the hospital and discharged one day later. AR 556-66. The Minnesota Multiphasic Personality Inventory-2 test was administered but produced invalid results "due to a rather exaggerated response pattern." AR 564.

The ALJ noted that Figgins was admitted again, this time for several days, in June 2011. AR 17. This resulted from a suicide attempt involving an overdose of Tylenol. AR 17, 614, 680-81, 687-90. Upon admission she was having a very difficult time controlling her emotions but had stabilized enough to be released five days later. AR 682. She returned to the emergency room in August 2011, stating that she was out of her prescription medication and was feeling anxious and angry. AR 669.

The ALJ next noted that progress reports during 2011 by Dr. Ramos and Judy Johnson, a nurse practitioner, indicated Figgins was doing reasonably well while on her medications. AR 17. By December 2011, Figgins reported that she was feeling much better and was hoping to be reunited with her children, who were in foster care. AR 17, 653. She also stated that she was looking for work and was attending school online on a full-time basis. AR 17, 654.

As for Figgins's reports of her daily activities, the ALJ noted that she acknowledged being able to "do everything at times." AR 19. He also described Figgins's reports that she likes being around people she knows, cares for her personal hygiene, prepares meals, shops, performs household chores and drives a car. *Id.* In addition, the ALJ noted that Figgins watches movies and television, takes part in arts and crafts activities, plays video games with friends and enjoys putting on makeup and singing. *Id.* Moreover, by the time of the hearing Figgins had custody of her children and testified that her daily activities include taking care of them and going to the store. AR 19, 41-42.

With regard to opinion evidence, the ALJ first discussed questionnaires completed by Nurse Johnson in May 2012, in which she reported that Figgins has difficulty managing stress in the workplace, has only fair-to-poor work-related abilities and should be limited to no more than part-time work. AR 17, 716-21. The ALJ found that this opinion was not entitled to great weight because (a) Nurse Johnson is not an acceptable medical source and (b) her assessment is not supported by either the evidence of record or Nurse Johnson's own treatment notes. AR 17.

A psychologist, Dr. Harper, provided opinions based on an evaluation of Figgins in August 2011 regarding her parenting abilities. *Id.* He diagnosed major depressive disorder, generalized anxiety disorder, borderline personality disorder and marijuana dependence. AR 17, 593-605. Dr. Harper found that Figgins was not capable of caring for her children and that she needed intensive mental health treatment. AR 603. He opined that her mental health issues were likely to interfere with her ability to maintain employment and recommended that she seek disability benefits. AR 604. The ALJ determined that Dr. Harper's opinions were not entitled to great weight. AR 18. He noted that the evaluation was conducted to determine Figgins's parenting abilities, not her ability to function in the workplace. He also found that Dr. Harper's opinion as to Figgins's ability to work was inconsistent with the evidence of record. *Id.*

Dr. Vos, a social worker, saw Figgins for regular therapy sessions beginning in February 2011. AR 17. In May 2012, Dr. Vos prepared a written opinion indicating that Figgins has serious limitations in her ability to function and noting that Figgins suffered from considerable stress and anxiety while working part-time for two months. AR 18, 707-09. Like Dr. Harper, Dr. Vos concluded that Figgins's mental health problems would continue to interfere with her ability to be employed. AR 709. The ALJ found that Dr. Vos's opinions were not entitled to great weight. AR 18. He noted that Dr. Vos's own records indicated that Figgins was stable and was making excellent progress. *Id.* He also found that Dr. Vos's opinions were inconsistent with other evidence in the record. *Id.*

The ALJ then discussed opinions provided by state agency consultants based on their review of Figgins's records. A medical consultant, Dr. Weis, found that Figgins's physical impairments of hepatitis C and obesity did not prevent her from being able to perform medium work. AR 19. Two psychological consultants, Dr. Wright and Dr. Tashner, found that Figgins had no more than moderate functional limitations, including moderate limitations in (a) the ability to carry out detailed instructions, (b) the ability to work in coordination with or in proximity to others without becoming distracted, (c) the ability to complete a workday and workweek without interruptions from psychological symptoms and (d) the ability to perform at a consistent pace without an unreasonable number and length of rest periods. AR 19, 80-83, 587. The ALJ found that the opinions of the psychological consultants were entitled to substantial weight because they were supported by the medical evidence, Figgins's work activities and her daily activities. AR 19.

After determining Figgins's RFC, he found that the limitations included in that RFC prevent her from performing any of her past relevant work. *Id.* This required the ALJ to proceed to Step Five and determine whether Figgins is able to perform other jobs that exist in significant numbers in the national economy. AR 20. Based on the VE's answers to hypothetical questions that incorporated Figgins's age, education,

work experience and RFC, the ALJ found the answer to be "yes." AR 20-21. The VE's testimony indicated that Figgins was capable of performing such positions as laundry worker, marker and housekeeper/cleaner. AR 20, 57. As such, the ALJ concluded that Figgins was not disabled within the meaning of the Act. AR 21.

## V.    THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## VI.    ANALYSIS

Figgins argues that the ALJ's decision must be reversed because it is not supported by substantial evidence in the record as a whole. In support of this argument, she contends (1) the ALJ improperly evaluated Figgins's subjective impairments, (2) the VE's testimony was flawed because it was based on improper hypothetical questions and (3) the ALJ erred in his weighting of the various medical opinions. *See* Doc. No. 11. I will address these issues separately, but not in the order Figgins presented them.

*A.*     *Did The ALJ Err In Evaluating The Medical Evidence?*

*1.*     *Applicable Legal Standards*

In evaluating a claim for DIB or SSI, the ALJ is required to consider all relevant evidence, including medical records and medical opinions. *See* 20 C.F.R. §§ 404.1513, 404.1520, 404.1520b, 404.1527, 416.913, 416.920 and 416.920b. With regard to medical opinions, the Commissioner's regulations give great deference to those provided by treating physicians:

> Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) [emphasis added]. This means a treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). But that opinion will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Hacker*, 459 F.3d at 937. The ALJ must

"always give good reasons" for the weight given to a treating physician's evaluation. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2); *see also Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

When a treating physician's opinion is entitled to controlling weight, the ALJ must defer to the physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). However, a treating physician's conclusion that an applicant is "disabled" or "unable to work" addresses an issue that is reserved for the Commissioner and therefore is not a "medical opinion" that must be given controlling weight. *Ellis*, 392 F.3d at 994.

The regulations distinguish opinions provided by licensed physicians and psychologists from those provided by physicians' assistants, nurse practitioners and other sources. 20 C.F.R. §§ 404.1513 and 416.913. The former are "acceptable medical sources" while the latter are not. *Id.* This means that the opinions of treating professionals such as nurse practitioners are not entitled to controlling weight. 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1); *see also Lacroix v. Barnhart*, 465 F.3d 881, 885–86 (8th Cir. 2006). Their opinions must still be considered, but they are not entitled to the deference afforded to medical opinions provided by a treating physician. 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1).

### 2. Discussion

#### a. Dr. Vos

Betty Vos, Ph.D., is a social worker and addictions counselor who had worked with Figgins for over one year as of the date of the hearing. AR 48-49. In May 2012, Dr. Vos completed a questionnaire describing Figgins's treatment and progress and

indicating that Figgins has serious limitations that will "interfere with her employability." AR 707-09. The ALJ determined that Dr. Vos's opinion was not entitled to great weight, stating that it was inconsistent with her own records. AR 18. The ALJ indicated that Dr. Vos's treatment records show Figgins's "excellent progress and stable condition." *Id.*

While there is no doubt that Dr. Vos is a treating source, there is a threshold issue as to whether she is an "acceptable medical source" whose opinion is generally entitled to controlling weight. Dr. Vos testified that she has a doctorate degree in social work and is a certified addictions and drug counselor. AR 48. The Commissioner's regulations define "acceptable medical sources" as follows:

(1) Licensed physicians (medical or osteopathic doctors);

(2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrists, for purposes of establishing visual disorders only (except, in the U.S. Virgin Islands, licensed optometrists, for the measurement of visual acuity and visual fields only);

(4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and

(5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. For this source, "qualified" means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence from the American Speech-Language-Hearing Association.

20 C.F.R. §§ 404.1513 and 416.913. A social worker, even with a doctorate degree, does not fall within any of these categories. And, in fact, the Eighth Circuit Court of Appeals has recognized that social workers are not "acceptable medical sources." *See, e.g., Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); *Tindell v. Barnhart*, 444 F.3d 1002, 1004-05 (8th Cir. 2006). Thus, the ALJ was not required to analyze Dr. Vos's opinion under the treating-source standard.

This does not mean her opinion has no relevance. The Commissioner considers a licensed clinical social worker to be an "other" medical source whose opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Social Security Ruling (SSR) 06–3p (Aug. 9, 2006); *see also* 20 C.F.R. §§ 404.1513 and 416.913; *Sloan*, 499 F.3d at 888-89. The standards for evaluating these opinions are as follows:

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For

example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

SSR 06–3p. The ALJ is required to explain his or her analysis:

[T]he adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.*

Here, the ALJ explained his decision to discredit Dr. Vos's opinion as follows:

The conclusion that the claimant cannot work is inconsistent with Dr. Vos' own records indicating her excellent progress and stable condition. Their assessments [those of Dr. Harper and Dr. Vos] are inconsistent with other substantial medical evidence of record as well as the overall evidence.

AR 18. While a better, more-detailed explanation was surely possible, I cannot find that the ALJ's reasons are contrary to the evidence. I have reviewed Dr. Vos's treatment notes in detail and find that they do, in fact, reflect that Figgins made significant progress while being counseled by Dr. Vos. Those notes cover dozens of interactions between Figgins and Dr. Vos during the period of time from March 2011 through March 2012 and consistently include comments about Figgins's progress. AR 607-46. On January 26, 2012, Dr. Vos wrote a progress report that described Figgins's improvement over the past year. AR 645-46. Among other things, Dr. Vos reported that Figgins had not used marijuana for the past four months. AR 646. Dr. Vos concluded as follows:

> Charity has learned to apply several skills on a consistent basis to manage her anxiety, focus on her goals and handle problematic situations effectively. She has successfully avoided harmful behaviors since April of 2011. She manages anger appropriately and is able to use interpersonal skills to ask for what she wants or needs and set functional boundaries. She has changed her social network. She no longer spends time with former using friends, and instead participates in a church and related positive activities. Shortly before Christmas, she was hired part time/seasonal through a church contact. She continued to turn in job applications through employment agencies and has recently been hired at Kraft.

*Id.* This particular report was directed to the advocate for Figgins's children, apparently in the course of an evaluation as to whether the children should be returned to Figgins. AR 645. While expressly discussing Figgins's efforts to obtain employment (and indicating that she had recently been hired), Dr. Vos did not state that Figgins's mental impairments would make it difficult for her to keep a job.

On March 13, 2012 – approximately two months after Figgins started working at Kraft – Dr. Vos prepared a very positive progress note, indicating that Figgins "continues in school and is working part time" and that she "is now appropriate for transition to Continuing Care." AR 644. This note stated that Figgins's children would be returned to her on March 15, 2012. *Id.*

On April 25, 2012, Dr. Vos wrote another progress report, again noting that Figgins had ceased all substance use since the previous September, was attending treatment regularly and "is consistently applying skills to improve her emotion regulation." AR 714. Dr. Vos also noted that Figgins had been working part-time at Kraft since January and that she had resumed caring for her children. *Id.* Dr. Vos then wrote: "I have been processing with her the impact of her work demands over the last three months, and I believe it would be wise for her to prioritize caring for her children over maintaining employment at the present time." *Id.* There are no treatment notes by Vos during the period of time between March 15, 2012 (the date the children were to be returned) and the date of this progress report. Thus, there is

nothing in Dr. Vos's records to suggest that Figgins actually reported any difficulties arising from the combined tasks of working and caring for her children.

On May 2, 2012, Dr. Vos prepared her written opinion for this case, directing it to Figgins's attorney. AR 707-13. According to that report, Figgins was no longer working at Kraft. AR 709. Figgins testified that she stopped working at Kraft because she "just mentally didn't feel like I could go." AR 39. In her report to Figgins's attorney, Dr. Vos referenced the "considerable stress and anxiety" Figgins suffered while working at the part-time job. AR 709. Dr. Vos concluded by expressing agreement with an August 2011 evaluation by Dr. Harper which had included a finding that Figgins's "mental health problems are going to continue to interfere with her employability." *Id.*

On this record, it was not improper for the ALJ to conclude that Dr. Vos's opinion in support of Figgins's disability claim was inconsistent with Vos's treatment notes and prior opinions. Over approximately one year of repeated interactions, Dr. Vos's treatment notes reflected consistent progress and improvements. AR 607-46. When supporting Figgins's effort to regain custody of her children, Dr. Vos spoke positively of Figgins's successful efforts to obtain employment. AR 646. She then continued to report positive progress for the next two months. AR 644. After Figgins's children were returned, however, Dr. Vos wrote an opinion in support of Figgins's application for disability benefits stating that Figgins's mental health problems would interfere with her employability. AR 709.

There is no evidence that Figgins's work performance at Kraft was deficient or that she was otherwise at risk of being discharged due to performance or attendance issues. Nor, as noted above, is there any indication in Dr. Vos's own contemporaneous treatment notes suggesting that Figgins was struggling with the stresses of working and caring for children. Under these circumstances, it was not unreasonable for the ALJ to question the credibility of Dr. Vos's opinions. Frankly, one could easily conclude that those opinions changed over a very short period of time to fit the differing purposes for

which they were offered. Simply put, I find that the ALJ provided good reasons, supported by substantial evidence in the record, for the weight given to Dr. Vos's opinions.

### b.    Dr. Ramos

Rogerio Ramos, M.D., has been Figgins's treating psychiatrist. AR 16. As such, he is clearly a treating source whose medical opinion may have been entitled to controlling weight. Unfortunately, Dr. Ramos did not provide an opinion concerning the nature and severity of Figgins's impairments. Nonetheless, Figgins points out that Dr. Ramos once recommended that Figgins "only work 20 hours per week due to her current state." AR 512. While it is not clear that Figgins is arguing that this was a medical opinion of a treating source that should have been given controlling weight, I reject that argument if it is being made.

First, Dr. Ramos made the "20 hour" recommendation in a treatment note before Figgins's alleged onset date. *Id.* Second, the recommendation was clearly based on Figgins's "current state." *Id.* There is no indication as to how long the recommendation remained in effect.[4] Third, an opinion that a patient cannot work on a full-time basis is not a "medical opinion" within the meaning of the Commissioner's regulations. *Ellis*, 392 F.3d at 994; *see also Zulinski v. Astrue*, 538 F. Supp. 2d 740, 751–52 (D. Del. 2008) (doctor's statement as to inability "to sustain full time, everyday work on a regular basis" was not a medical opinion).

Dr. Ramos's treatment records are part of the record in this case. Thus, the ALJ was required to consider those records and, in fact, discussed them in his decision. AR 16-17. However, because Dr. Ramos provided no medical opinions in this case, the ALJ was not required to determine whether those opinions were entitled to controlling weight.

---

[4] A progress note authored by Dr. Ramos just six weeks after he made the "20 hour" recommendation makes no mention of that recommendation. AR 548.

### c.     *Nurse Johnson*

Judy Johnson, ARNP, issued two written opinions in May 2012 indicating that Figgins had difficulty managing stress in the workplace, causing her work-related abilities to be only poor to fair.  AR 716-21.  Nurse Johnson stated that Figgins could work on a part-time basis but recommended long-term disability benefits.  AR 721. The ALJ determined that Nurse Johnson's opinions were not entitled to great weight. AR 17.  First, he noted that a nurse practitioner is not an acceptable medical source. *Id.*  This is correct.  *See* 20 C.F.R. §§ 404.1513 and 416.913.  Next, he found that the marked limitations suggested by Nurse Johnson are not supported by either her own treatment notes or Figgins's own reports concerning her activities.  AR 17.

I find that these are sufficient reasons, supported by the record, for not giving great weight to Nurse Johnson's opinions.  As the ALJ pointed out, Nurse Johnson's treatment notes from late 2011 and early 2012 reflect progress and improvements.  For example, a progress report in December 2011 stated that Figgins was doing "much better," was looking for work and was in the process of attempting to re-gain custody of her children.  AR 653-54.  The record contains no intervening progress reports from Nurse Johnson that suggest the limitations she described in the opinions she issued in May 2012.

Finally, and as discussed above with regard to Dr. Ramos, Nurse Johnson's opinion that Figgins could perform only part-time work is not a medical opinion.  In short, I find no basis to disturb the ALJ's assessment of Nurse Johnson's opinions.

### d.     *Dr. Harper*

George Harper, Ed.D., a licensed psychologist, conducted a psychological examination of Figgins in August 2011 for purposes of assessing her parenting abilities. AR 597-605.  Among other things, he reported that Figgins's "rather insidious mental health problems are probably going to continue to interfere with her successful

employment." AR 604. He then recommended that she apply for Social Security Disability benefits, noting that her "level of stress might be reduced if she is found to be eligible for such." *Id.*

Dr. Harper, as a licensed psychologist, is an "acceptable medical source." 20 C.F.R. §§ 404.1513 and 416.913. However, Figgins acknowledges that he is not a treating source. Doc. No. 11 at 31. Thus, the ALJ was not required to examine the question of whether Dr. Harper's opinions were entitled to controlling weight.

In determining that his opinions were not entitled to great weight, the ALJ relied on the fact that they were given in the context of evaluating Figgins's parenting abilities, not for purposes of determining Figgins's ability to work within the meaning of the applicable Social Security rules and standards. AR 18. The ALJ also found that Dr. Harper's conclusion that Figgins cannot work is inconsistent with other substantial medical evidence in the record and with the overall evidence. *Id.* As with Dr. Vos's opinions, a greater explanation of these reasons would have been helpful. Nonetheless, I cannot find that the ALJ erred in declining to give great weight to Dr. Harper's opinions.

Dr. Harper's written report, while extensive, does not specifically address Figgins's employment-related abilities and restrictions. AR 597-605. This is not surprising in light of the fact that the evaluation was not conducted for that purpose. Indeed, Figgins's brief does not cite to any specific opinion by Dr. Harper that the ALJ should have adopted, other than his conclusion that Figgins's mental health issues would interfere with her successful employment. Doc. No. 11 at 30-31.

As noted above, however, an opinion that an applicant is not able to work is not a medical opinion. *Ellis*, 392 F.3d at 994. Thus, the ALJ was not required to consider Dr. Harper's conclusion that Figgins's mental health issues will "probably" interfere with successful employment. Instead, the ALJ was required to give consideration to any opinions as to the nature and severity of Figgins's impairments, including symptoms, diagnosis and prognosis, what she was capable of doing despite her

impairments, and the resulting restrictions. 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2). To the extent Dr. Harper's report does describe restrictions that might translate to the workplace, the ALJ did not ignore those restrictions. For example, Dr. Harper noted that Figgins has limited social skills that may contribute to "awkward, inept or inappropriate management of interpersonal relationships." AR 602. The ALJ, in determining Figgins's RFC, found that she is limited "to simple, routine, repetitive work with superficial contact with the public and no more than a regular pace." AR 15.

In short, I find that the ALJ gave sufficient reasons, supported by the record, for not giving great weight to Dr. Harper's opinions. As such, I will not disturb the ALJ's assessment of those opinions.

### e. State Agency Consultants

The ALJ gave great weight to the opinions of three medical consultants who reviewed Figgins's records but did not examine her. AR 19. In December 2010, Dennis Weis, M.D., found that Figgins's physical impairments of hepatitis C and obesity did not prevent her from performing medium work. AR 80-81, 84-85. In January and April of 2011, Dee Wright, Ph.D., and Myrna Tashner, Ed.D., found that Figgins's mental impairments caused no more than moderate functional limitations. AR 81-83, 587. The ALJ found that all of these opinions are entitled to substantial weight because they are supported by the evidence and consistent with the record as a whole. AR 19.

Figgins complains that it was error for the ALJ to rely on these opinions because they were issued over a year before the hearing in this case. She contends that the consultants did not have access to a substantial quantity of medical records generated after they formed their opinions. Of course, some period of time always passes between a consultant's review of an applicant's records and a hearing before an ALJ.

The opinions of a medical consultant do not have an expiration date. *See, e.g.,*
*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state
agency review precedes ALJ review, there is always some time lapse between the
consultant's report and the ALJ hearing and decision. The Social Security regulations
impose no limit on how much time may pass between a report and the ALJ's decision
in reliance on it."); *see also Kohn v. Colvin*, No. C13-4003-MWB, 2013 WL 5375415,
at *13 n.5 (N.D. Iowa Sept. 26, 2013). Here, the subsequent medical records were
part of the evidentiary record and were examined by the ALJ. The ALJ was thus in a
position to compare those records to the consultant's previously-issued opinions.
Procedurally, this was not improper.

Substantively, Figgins contends in general terms that the subsequent records
demonstrate greater levels of impairment than those found by the medical consultants.
However, she cites to no specific pages of the record in making that argument. Doc.
No. 11 at 31-32. There is no doubt that Figgins suffered from some serious setbacks
during 2011 and that the consultants' opinions were issued before those events took
place. AR 17-18. At the same time, as the ALJ noted, the medical evidence reflects
significant improvement later in the year, and continuing into 2012. *Id.* The ALJ had
access to all of the records and was in a position to determine whether the consultants'
previously-issued opinions were consistent with the evidence as a whole. I cannot find
that his decision to afford substantial weight to the consultants' opinions is contrary to
substantial evidence in the record.

### f.    GAF Scores

Figgins also argues that the ALJ erred in failing to address the various global
assessment of functioning (GAF) scores assigned by various mental health providers

who treated and examined her.[5]  She contends that her GAF scores "were generally in the 40's and 50's" and states that these scores demonstrate serious symptoms that support a finding of disability.  Doc. No. 11 at 28-29.

The Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements in our mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed Reg. 50,746, 50,764-65, 2000 WL 1173632 (August 21, 2000).[6] Thus, while GAF scores are relevant and should be considered, they are "not essential to the accuracy of an RFC determination." *Earnheart v. Astrue*, 484 Fed. Appx. 73, 75 (8th Cir. 2012) (citing *Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010)).

Here, the psychologist and nurse practitioner who regularly examined Figgins consistently assigned a GAF score of 55 and increased that score to 60 in December 2011.  AR 512-13, 548, 586, 649-51, 654, 656.  While Dr. Harper assigned a GAF score of 40 during his only evaluation of Figgins in August 2011, Figgins's regular providers assigned scores of 55 before and after that evaluation. AR 603, 650-51. Moreover, Figgins's claim that her GAF scores were "generally in the 40's and 50's" is somewhat misleading.  Most of the scores she cites pre-date her alleged disability onset date of November 5, 2010.  Doc. No. 11 at 28.  Of the scores assessed after the alleged onset date, Figgins had only had three scores below 55.  Two of those scores

---

[5] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV).

[6] The Commissioner points out that the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), released in May 2013, no longer uses GAF scores to rate an individual's level of functioning.  *See Rayford v. Shinseki*, No. 12-0042, 2013 WL 3153981, at *1 n.2 (Vet. App. June 20, 2013) (citing DSM-V 16 (5th ed. 2013)).  Use of the GAF scale was abandoned because of, *inter alia*, "its conceptual lack of clarity" and "questionable psychometrics in routine practice." *Id*.

were associated with her hospitalizations for suicidal ideation in January 2011 and a suicide attempt in June 2011. AR 561-62, 683-85. Dr. Harper's score of 40 is the only other score below 55. AR 603, 649-51. GAF scores of 51-60 indicate only moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV at 34. Figgins's GAF scores during the relevant period of time do not establish that the ALJ's decision is unsupported by substantial evidence in the record as a whole.

### g.     The *Nevland* Problem

So far I have found that the ALJ's weighting and analysis of the medical evidence was supported by substantial evidence in the record. This case turns, however, on what is *not* in the record. The ALJ found, at Step Four that Figgins is not capable of performing past relevant work. AR 19. He then found, at Step Five, that she can perform various other jobs that exist in the national economy. AR 20-21. However, the ALJ made this finding without the benefit of a medical opinion from any acceptable treating or examining source concerning Figgins's functional limitations. Instead, as discussed above, the record contains:

     i.     Treatment records, but no medical opinions, from Dr. Ramos, a treating psychiatrist.

     ii.    Treatment records and opinions from a social worker and a nurse practitioner, neither of whom is an acceptable medical source.

     iii.   An opinion from an examining psychologist who evaluated Figgins's parenting abilities, not her vocational abilities and limitations (and whose opinion the ALJ rejected).

     iv.   Opinions from state agency medical consultants who never examined Figgins.

In short, while the record in this case contains a rather unique array of evidence concerning Figgins's mental impairments, it does not contain a medical opinion from an acceptable treating or examining source as to her mental RFC. As the Eighth Circuit Court of Appeals has explained, this presents a problem:

> In our circuit it is well settled law that once a claimant demonstrates that he or she is unable to do past relevant work, the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do. *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir. 1982)(en banc); *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983). It is also well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).
>
>         \*       \*       \*
>
> In the case at bar, there is no *medical* evidence about how Nevland's impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir.1999). Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Id*. In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity. As this Court said in *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir.1975): "An administrative law judge may not draw upon his own inferences from medical reports. *See Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir.1974); *Willem v. Richardson*, 490 F.2d 1247, 1248–49 n. 3 (8th Cir.1974)."

*Nevland v. Apfel*, 204 F.3d 853, 857-58 (8th Cir. 2000).

Judge Bennett recently concluded that *Nevland* remains binding precedent in this circuit with regard to both the Commissioner's burden at Step Five and the ALJ's obligation to fairly develop the record. *Hattig v. Colvin*, Case No. C12-4092-MWB, 2013 WL 6511866, at *9-11 (N.D. Iowa Dec. 12, 2013). He recognized that remand may not always be required under these circumstances if there is a great deal of medical evidence supporting the RFC determination. *Id.* at *10 (citing *Agan v. Astrue*, 922 F. Supp. 2d 730, 755-56 (N.D. Iowa 2013)). Indeed, this possibility arises directly from the *Nevland* panel's use of the word "ordinarily." *Nevland*, 204 F.3d at 858.

Here, I find that the record is significantly less-developed than that in *Agan*, the "exception" case. As noted above, the opinions provided by the non-treating, non-examining medical consultants were issued over a year before the ALJ's hearing. After those opinions were issued, Figgins suffered serious setbacks and, indeed, required hospitalization after a suicide attempt. AR 17. While I have determined that it was not error for the ALJ to give substantial weight to those opinions as part of the RFC determination, this does not mean those opinions satisfy the *Nevland* standard. This is especially true in light of the paucity of other medical evidence in the record as to Figgins's functional capabilities and limitations relating to her mental impairments. Applying *Nevland*, I find that the ALJ failed to fulfill his obligation to fully and fairly develop the record by neglecting to either (a) obtain a medical opinion concerning Figgins's mental RFC from Dr. Ramos, the treating psychiatrist, or – at least – (b) arranging a consultative psychiatric or psychological examination to obtain such an opinion. Remand is necessary to correct this error. Once the record is fully developed with the necessary medical opinion evidence, the ALJ shall revisit his determination of Figgins's RFC and, if necessary, shall conduct a new evaluation at Step Five concerning Figgins's ability to perform other work that exists in the national economy.

**B.      Did The ALJ Err In Assessing Figgins's Credibility?**

Figgins argues the ALJ did not provide good reasons for discrediting her subjective allegations. She contends that he did not discuss all of the relevant factors and offered only a "minimal analysis" to explain his determination. Doc. No. 11 at 21. In particular, she argues that the ALJ failed to consider her past work record and the observations of others. *Id.* The Commissioner argues Figgins is essentially asking the court to reweigh the evidence, which is improper, and that the court should uphold the ALJ's credibility determination because he provided good reasons which are supported by substantial evidence in the record as a whole.

The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322. The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). The ALJ is not required to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

The ALJ acknowledged the *Polaski* factors by citing the relevant regulations and Social Security rulings. AR 16. He found Figgins was not a credible witness to the extent that she alleged disability and the inability to perform all work activity. *Id.* He referred to Figgins's own function reports, in which she indicated that she can "do everything at times," likes to be around people she knows, can care for her own personal hygiene, prepare meals, do household chores, drive a car and go shopping.

AR 19 (citing AR 286-93, 319-27). The ALJ also noted that Figgins reported daily activities that include taking care of her children and doing crafts with them, visiting friends, watching television, painting and playing video games. *Id.* He found that these abilities and activities are inconsistent with Figgins's claim of being disabled. *Id.* This is an appropriate analysis. *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).

The ALJ also pointed out that during the time Figgins alleges disability, she worked part-time and was looking for full-time work. AR 18. The ALJ is entitled to take these facts into consideration while weighing Figgins's credibility. *Goff*, 421 F.3d at 792 ("Working generally demonstrates an ability to perform a substantial gainful activity."); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (not unreasonable for the ALJ to note that the claimant's "part-time work . . . [was] inconsistent with her claim of disabling pain."); *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) ("Seeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain.").

The ALJ also relied on his analysis of the medical evidence in assessing Figgins's credibility. AR 16-18. He concluded that the evidence, including records from Dr. Vos and Dr. Ramos, demonstrated continued progress and improvement. AR 17-18. As discussed *supra*, I find that the ALJ's assessment and weighting of the medical evidence was not erroneous.

Figgins complains that the ALJ did not adequately consider her poor work history and that this factor bolsters her credibility. In fact, the ALJ did discuss Figgins's work history and acknowledged that her former employers assessed her work performance and attendance as poor. AR 19. Nonetheless, in light of the medical evidence and Figgins's own statements as to her abilities and activities, the ALJ found that Figgins was "capable of unskilled work notwithstanding the difficulties reported." *Id.* In other words, the ALJ did not ignore Figgins's work history, he simply did not give it the level of significance that Figgins would have liked. This was not error.

Finally, Figgins complains that the ALJ's credibility determination is flawed because her allegations are supported by a third-party function report submitted by her sister. AR 294-303. The ALJ discounted her sister's statements because, in his view, the evidence as a whole shows that Figgins is capable of unskilled work despite her impairments. AR 19. Thus, the ALJ discounted the third-party function report for the same reasons he discounted Figgins's own statements. Because I have found that the ALJ's reasons for finding Figgins's allegations to be less than fully credible were appropriate, the same holds true with regard to Figgins's sister's allegations.

In reviewing the ALJ's credibility determination I must consider the evidence that both supports and detracts from the ALJ's decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis,* 392 F.3d at 993). I cannot reverse the ALJ's decision simply because some evidence would support a different conclusion. *Id.* at 1091. Instead, I must defer to the ALJ's determination regarding the credibility of testimony as long as it is supported by good reasons and substantial evidence. *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). That is the case here. As such, I will not disturb the ALJ's finding concerning Figgins's credibility. Nonetheless, on remand, and after obtaining the medical evidence addressed in Part A(2)(g), *supra*, the ALJ shall consider whether that evidence affects his credibility assessment.

## C. *Was The VE's Opinion Testimony Flawed?*

Figgins next argues that the ALJ erred in relying on the VE's testimony because the ALJ improperly formulated hypothetical questions that did not encompass all of Figgins's impairments. Figgins correctly notes that when a hypothetical question fails to include all relevant impairments, the VE's answer to that question does not constitute substantial evidence. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). She points out that when the limitations she believes are supported by the evidence were added to

the hypothetical questions, the VE testified that no jobs would be available in the competitive market. AR 58.

I have already concluded that I must recommend remand because the ALJ failed to fully and fairly develop the record by obtaining a medical opinion, either from a treating physician or via a consultative examination, as to Figgins's mental RFC. Taking these steps on remand will require the ALJ to re-evaluate Figgins's RFC. If that process results in changes to the ALJ's findings concerning Figgins's RFC, then the ALJ will have to determine whether it is necessary to obtain additional VE testimony based on the reformulated RFC.

## VII. CONCLUSION AND RECOMMENDATION

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **reversed** and this case be **remanded** for further proceedings consistent with this report. Judgment should be entered in favor of Figgins and against the Commissioner. On remand:

1.      The ALJ must fully and fairly develop the medical evidence concerning Figgins's mental RFC. At minimum, this will require that the ALJ obtain a medical opinion concerning Figgins's mental RFC from either a treating source (such as Dr. Ramos) or, at least, a consultative examining psychiatrist or psychologist.

2.      The ALJ must, after obtaining this medical opinion, re-evaluate Figgins's RFC and, if necessary, determine whether she is able to perform work that exists in the national economy. This may require the ALJ to obtain additional VE testimony.

3.      The ALJ should also consider whether the newly-obtained medical opinion evidence impacts the ALJ's assessment of Figgins's credibility.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the

parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 2nd day of January, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE